**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD E. GREISHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | |
| **v.** | ) | **06-184 ERIE** |
| | ) | |
| **BASE MANUFACTURING,** | ) | |
| **STEVE SOUTH, an individual, and** | ) | |
| **B. HARRY STRACK, JR., an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION

Don Greishaw, a former salesman, has sued Base, its President, and Vice-President, over sales commissions he claims the company owes him. The sole basis for his claim is a phone call he made to a Base employee named Gail Sliger after he learned his employment was being terminated. It is not disputed that Sliger told Greishaw that a computer screen she looked at showed that he had over $6 million in sales between November 1, 2005 and June, 2006 when he was fired. However, it is also undisputed that this number was wrong, very wrong. Sliger is an accounts payable clerk, and has nothing to do with sales or commissions. She did not know where the information she looked at came from, how it was compiled, or what it was used for. In fact, the number she read to Greishaw represented Greishaw's career sales during the entire 3 ½ years he worked for the company, not the last 9 months. Base paid Greishaw all the commissions he earned, and has disclosed copious documentation of his sales and commissions. Those documents show that Base does not owe Greishaw any money. Rather, when his employment ended, Greishaw had received over $45,000 in draws in excess of commissions earned . It is Greishaw who owes Base money.

After the lawsuit was filed – even before discovery commenced – Base supplied Greishaw with records detailing all his sales and commission history, and explaining why the number Sliger gave Greishaw was wrong. Greishaw refused to accept this explanation, and also refused to produce evidence that would substantiate his claimed damages. On March 29, 2007 this Court granted a Motion to Compel filed by Defendants, and generously gave Plaintiff 60 days to put some "flesh on the bones" of his damages claim. Ninety-seven days later, Plaintiff finally responded with a one-page "revised estimated calculation of damages" that, again, relied exclusively on the erroneous number Sliger had given him, a number which Defendants had repeatedly explained was incorrect.

The Plaintiff has the burden of proof on damages, and cannot withstand summary judgment unless he can come up with evidence – not a mere assertion – to support that claim. As this memorandum and the attached exhibits demonstrate, Plaintiff has utterly failed to produce any evidence of commissions owed beyond his initial assertion that "Gail told him." Because Greishaw has failed to produce evidence to substantiate his claims, summary judgment should be entered in favor of Defendants on all Plaintiff's claims.

FACTS

A.    <u>Initial Commission Arrangement</u>.

In December 2002 Defendant Base Manufacturing, Inc. ("Base"), a manufacturer of industrial shelving located in Monroe, Georgia, hired Plaintiff Don Greishaw, a resident of Pennsylvania, as an outside salesperson. (Amended Complaint ¶9 (Appendix ("App.") Ex. A). Greishaw had formerly worked as a salesman for Kingway, a company also based in Georgia that manufactures products similar to Base's. (Deposition of Don Greishaw ("Greishaw dep.")(App. Ex. B) at 11, 119; Greishaw dep. Ex. 1 (App. Ex. C)). Defendant Steve South, Base's President and

2

CEO, orally agreed with Greishaw that he would receive $40,000 annually in salary, plus 1.5%

commission on gross sales.  (Amended Complaint (App. Ex. A) ¶11;Greishaw dep. (App. Ex. B)

at12).  Base expected Greishaw to generate at least $2 million a year in gross sales.  (Deposition of

Steve South ?South dep.") (App. Ex. D) at 16-17).  During the first 16 months he was working for

Base Greishaw made $1,731,076.59 in gross sales – falling short of the goal – and received a total

of $67,477,72 in salary plus commissions.  (Greishaw dep. Ex. 3 (App. Ex. E)).

B.      Change From Salary Plus 1.5% Commission To 30% Commission.

On or about March 1, 2004, the compensation agreement between Base and Greishaw was

changed.  Henceforward Greishaw would receive $36,000 annually as a draw against commissions,

and would earn commissions on sales calculated as 30% of gross profits.  (Amended Complaint

(App. Ex. A) ¶12; Greishaw dep. (App. Ex. B) at 41-42).  Under this arrangement, which was Base's

standard arrangement with its sales force, a salesman was credited with making a sale based on the

invoiced amount, but the amount of his commission was determined and payable only after payment

was collected.  (Deposition of Harry Strack ("Strack dep.")(App. Ex. F) at 6-8, 12).  In other words,

a commission is "earned" when the order is shipped and the customer billed, and net profit and

commission can be calculated; but the commission becomes "payable" only when the customer has

paid Base, if the amount exceeds outstanding draws, expenses, and prior commission payments.

(Strack dep. (App. Ex. F) at 21-23).  An inaccurate initial quote, increased materials or freight costs,

or unanticipated installation expenses may have a negative impact on the profitability of a job.

(Strack dep. (App. Ex. F) at 56-58). A salesman is expected to manage each job and see it through

to ensure that the various aspects of the job are being properly and efficiently completed and that

the "bottom line" shows a net profit.  (Strack dep. (App. Ex. F) at 51).

Defendant Harry Strack informed Greishaw when the change from salary plus 1.5% of sales to straight commission on 30% of profit was made, and invited him to discuss the matter with South if he wished; Greishaw never did. (Greishaw dep. (App. Ex. B) at 17, 43). Strack is Base's Vice President, and is responsible for the financial and administrative aspects of the business, including calculating sales commissions. (Strack dep. (App. Ex. F) at 5). The arrangement was further modified in August 2004 to increase the cost of installation and outside purchases by 15% to account for overhead and profit. (Strack dep. (App. Ex. F) at 10).[1] This commission plan was the standard plan that Base had been using since at least June 2002 (before Greishaw was hired) for its other salespeople, and was designed to emphasize bottom-line profitability, rather than simply sales volume. (Greishaw dep. Ex. 4 (App. Ex. G)).

C.    Base's Policy For Crediting Commissions.

Base does not confine its salespeople to any particular geographic territory: they are free to sell to any customer who will buy. (App. Ex. G; South dep. (App. Ex. D) at 9). However, a salesman is not entitled to a commission on a sale unless he coordinates and facilitates the sale with Base's customer service department, which is staffed by Donna Powell. (Greishaw dep. Ex. 5 (App. Ex. H); South dep. (Ex. D) at 9-11; Deposition of Donna Powell ("Powell dep.") (App. Ex. I) at 14-15). Powell prepares official quotes for jobs based on information from the salesman and Base's material costs, and applies standard discounts based on volume. (Powell dep.(App. Ex. I) at 7-8).

---

[1] Upon review of his deposition, Strack noted a need to clarify his testimony, which in the deposition was limited to offsetting expenses against commissions beginning in August 2004. (Strack dep. (App. Ex. F) at 10). He determined that expenses should have been deducted from the beginning of the new commission plan in March 2004, and that the August 2004 change was to increase the cost of installation and outside purchases by 15% to account for overhead and profit. (Strack dec. (App. Ex. O) at ¶16). This change is not a material fact that would affect the outcome of this case.

When Powell knows that a particular salesman is associated with a particular customer, she credits that salesman with sales to that account: but if a salesman plays no role in making a sale – for example, when a customer calls Base directly – the sale is treated as a "house" account and no sales commission is paid.  (Powell dep. at 15) Accounts are site- or location-specific.  (Powell dep.(App. Ex. I)  at 16, 19).  For example, South gave Greishaw a Crown Lift account in New Jersey and part of a TJMaxx account.  (Powell dep. (App. Ex. I) at 17).   Greishaw received commission credit for the sales he handled for those accounts.  (Id. & App. Ex. J (Bates stamped docs. 0149-209). Consistent with Base's policy, he did not receive commissions on sales to any customers where he did not play a role.  (Id. & App. Ex. H (Greishaw Dep. Ex. 5)).  Given Base's policy of awarding commissions only when a salesman plays a role in making the sale, it was not possible for Base to sell 'behind a salesman's back" and thus deprive him of a commission: if the salesman was ignorant of the sale, he perforce was not involved and therefore was not entitled to a commission on that sale. (App. Ex. H; Declaration of Steve South ("South dec.") (App. Ex. K) at ¶11, 13).

D.    <u>March 2005 Commission Payment</u>.

In March 2005 Base sent Greishaw a commission check for $40,000.00.  (Greishaw dep. (App. Ex. B) at 38).  With South's approval, Strack sent Greishaw that check because he had determined that, at that time, Greishaw had earned approximately that amount in commissions under the 30% of profits commission arrangement.  (Strack dep. (App. Ex. F) at 25).  Greishaw and Strack spoke by telephone at about that time.  (Id.).  Greishaw recounted the conversation as follows:

> Harry called me up.  And he said – you know, asked how I was doing.  Harry and I were friends.  And we were joking around a little bit.  And then he goes, what do you think of the check.  And I said, that is very nice, thank you very much, I appreciate that.  And he goes, you're welcome.  And he said, what do you think of the size.  And I go, that's very nice. And I said, it looks to me like it equates to about 5 percent of sales.  And he says, yes, you can use that.

(Greishaw dep. (App. Ex. B) at 43).

Between March 2004, when the commission scheme changed, and the end of the fiscal year on October 31, 2004, Greishaw had $2,384,287.74 in gross sales (based on invoiced amounts). (App Ex. E at 00020).[2]  In September 2005, Greishaw made a sale worth over $2 million to Food Tech Structures, a customer that South had spent a great deal of time and energy developing and had given to Greishaw. (Greishaw dep. (App. Ex. B) at 107; South dec. (App. Ex. K) at ¶15; South dep. (App. Ex. D) at 6-7). In an effort to stimulate Greishaw's performance, South had referred Food Tech and several other established Base customers that had facilities in Greishaw's geographical area to him.  (South dep.(App. Ex. D)  at 7-8; South dec. (App. Ex. K) at ¶¶12m 14).  These customers included Perkins Paper, Inc.; The TJX Companies, including Marmaxx and Marshall's Distribution), and the afore-mentioned Food Tech.   Consistent with Base's policy, Greishaw received credit for all sales to these companies in which he played any role.  (App. Ex. E at 0001-0020; App. Ex. J (Bates stamped docs 0149 - 0209 ); South dep. (App. Ex. D) at 7-9, 11-12).  The Food Tech sale was "booked" (recorded as an order" in September 2005, but was included in fiscal year beginning November 1, 2005 and ending with the end of Greishaw's employment in July 2006. Of the $2,232,065.31 sales reported for Greishaw during this final period, only $251,092.69 was attributable to sales other than Food Tech.  (App. Ex. E at 0001; Strack dec. (App. Ex. O) at ¶14).

E.    Termination of Employment.

After closing the $2 million Food Tech sale that South gave him in September 2005,

---

[2]  The total sales figures appear near the bottom of the document.  The exhibit bears a typographical error and incorrectly states the FY end as 7/31/04; it should read 10/31/04.

Greishaw's sales performance deteriorated.   In the 8-month period between November 2005 and the end of his employment in July 2006 Greishaw had only approximately $250,000 in invoiced sales. (Strack dep. (App. Ex. F) at 49; South dep. (App. Ex. D) at 19-20; App. Ex. E at 20[3]).  During his entire career as a salesman for Base, from December 2002 to July 2006, Greishaw made $7,105,328.42 in gross sales and received a total of $194,065.77 in salary and commissions.  (App. Ex. E at 0001, 0020).

At the end of 2005, Greishaw and Strack exchanged e-mail messages concerning Greishaw's Christmas bonus and whether he was due any commissions.  (Greishaw dep. (App. Ex. B) at 37; App. Ex. L).  Strack initially told Greishaw that he was going through his records, and would get back to him when he had completed the review and determined what, if any, commission was due. A few days later, Strack informed Greishaw that he had completed the review and that no commissions were due at that time. (Id.).  Greishaw did, however, receive a $1000 Christmas bonus from Base.  (Greishaw dep. (App. Ex. B) at 36).

Disappointed by the downward trend in Greishaw's sales performance – only about $250,000 in invoiced sales excluding Food Tech, and no indication of good prospects for improvement – South communicated with Greishaw by e-mail. (App. Ex. M).  South inquired about the Food Tech installation, which was encountering delays and difficulties.  (Id.).  Dissatisfied with Greishaw's performance, South decided to terminate his employment.  (South dep. (App. Ex. D) at 14).  On June 27, 2006, Strack advised Greishaw of South's decision to terminate his employment effective July 15, 2006.  (Amended Compl. (App. Ex. A) ¶21).   Strack subsequently left a telephone message on

---

[3] The entry for "total sales 11/1-05 to present" on page 20 of Greishaw Dep. Ex. 3 includes the Food Tech sale.

Greishaw's answering machine saying that he was reviewing records to determine the amount of any commissions that might be due Greishaw. (Greishaw dep. (App. Ex. B) at 69-70).[4]  After he completed the review, Strack determined that Greishaw was not due any commissions; in fact, by the time his employment was terminated, he had received $$48,146.33 in draws in excess of commissions earned. (App. Ex. E at 0001(bottom line)).

F.    Greishaw's Phone Conversations With Sliger And Powell.

After he learned that his employment would be terminated effective July 15, 2006, Greishaw telephoned Gail Sliger. (Greishaw dep. (App. Ex. B) at 77). Sliger works in Base's purchasing and accounts payable  department and is not involved in sales or commissions. (Deposition of Gail Sliger ("Sliger dep.") (App. Ex. N) at 4-5). Greishaw told her that he was being fired. (Greishaw dep. (App. Ex. B) at 78-79). Although the parties differ somewhat about the sequence of the conversation, Greishaw states that Sliger advised him over the telephone that a computer record she viewed at his request showed that he had $6,277,602.25 in sales between October 1, 2005 and July 7, 2006. (Greishaw dep. (App. Ex. B) at 77-79). At her deposition, Sliger acknowledged making this statement to Greishaw, but added that she was not familiar with the data base where she found that number, that she did not handle sales information, and did not know where the information she

---

[4]  Greishaw's tape recording of the phone message was read into his deposition (pp. 69-70) and reads in its entirety as follows: "Monday, 8:34 p.m. Hey, Don, it's Harry. Hope everything is going well with you. Regret the way things turned out there, and I apologize for not talking to you sooner. I'm working on getting your – whatever commissions you might have coming, and I'll get that done as soon as I can for you. I need to get the password to this laptop you sent back so I can – os I can use it, get it going again. If you would just call either – either e-mail me or give me a call and let me know that. If you don't get me, just leave a message on my voice mail, and I would appreciate it. As I said, I'll be – I'm working on trying to get everything finalized on these contracts right now, and I'll get you something as soon as I can. Thank you, Don.

looked at came from or what it was used for.  (Sliger dep. (App. Ex. N) at 6).  She stated that he asked her to print the information out and send it to him, but that she refused.  (Id. at 7).

In fact, the information Sliger read to Greishaw is not used by Base for any purpose. (Declaration ("Strack dec.") (App. Ex. O) at ¶8).  Rather, the "sales by salesman" screen is an unused feature of Base's computer program that was built in to the system, and automatically accumulates sales data from other sources.  (Id. at ¶8).  This feature was designed to be manually reset at the beginning of each fiscal year to record year to date sales.  (Id.).  Because Base has never used this feature for any purpose, it has never reset it; accordingly, although the data screen appears to give "year to date" sales by salesman, the number on the screen is false: it actually reflects all sales since the system was started, not "year to date" sales as it appears to indicate.  (Id.).  When this data set was accessed in January 2007, it showed substantial false "year to date" sales numbers for 12 former Base salesman none of whom had been employed at any time during the fiscal year that the system purported to show their "year to date" sales.  (App. Ex. P).[5]  For example, for Mike Maas, whose last day worked was February 15, 2004, the screen falsely shows that he had $95,694.70 in "year to date" sales between November 1, 2006 and January 2007, an obvious impossibility since Maas had not been employed by Base for almost 3 years at that time.  (Id.) Likewise, for Bill Elliott, whose last day worked was June 12, 2003, the screen falsely shows that he had a total of $9,204,679.38 in year to date sales s of January 2007, again impossible because he had not been employed by Base for more than 3 years (Id.) Gail Sliger was reading from this data field when she gave Don Greishaw the inaccurate $6 million year to date sales number over the

_____

[5]  This information was disclosed and explained to Plaintiff in the course of his March 29, 2007 deposition.  *(See* Greishaw dep. at 96-99).

9

telephone. (Sliger dep. (App. Ex. N) at 6-7). The system had not been reset at all since before Greishaw was hired in December 2002. (Strack dec. (App. Ex. O) at ¶8). The $6 million figure Sliger gave Greishaw over the phone thus represented not his year to date sales since November 1, 2006, but rather his entire sales history with Base since he was hired in December 2002. (Strack dec. (App. Ex. O) at ¶8).

Shortly after learning that his employment was being terminated, Greishaw also contacted Donna Powell, Base's customer service representative who prepares quotes for the salesmen. (Greishaw dep. (App. Ex. B) at 81). Greishaw asked Powell to print out some sales reports for him, and she complied and sent them to him. (Powell dep. (App. Ex. I) at 11). She had no information about whether Greishaw was owed any commissions. (Id.).

G.    Quest For Evidence To Support Plaintiff's Claim Of $6 Million-Plus Sales After November 1, 2005.

Because he asserted in his Complaint that he had over $6 million in sales during the last 9 months of his employment, Defendants submitted discovery requests to Plaintiff asking him to explain the factual basis for this claim.[6] Defendants received an unsatisfactory response; the Complaint contained only Plaintiff's allegation, and Plaintiff's Initial Disclosures provided no

---

[6] From Defendants' First Interrogatories (App. Ex. Q), served November 12, 2006: DEFENDANTS' INTERROGATORY NO. 2. Describe in detail any and all amounts of money which you contend you are owed by Defendants, explaining in detail the manner in which you arrived at those conclusions and identifying each document you relied on in making those calculations. *[NOTE: Defendants also requested Plaintiff to produce all documents identified in response to interrogatories. See Defendant's Interrogatories and First Request for Production (App. Ex. O]*.

documentation of claimed sales.[7]  Defendants moved to compel, and on March 29, 2007 following

oral argument the Court granted Defendant's Motion, ordering Plaintiff to put some "flesh on the

bones" of his damages claim within 60 days.  (Transcript of March 29, 2007 hearing ("T.") (App.

Ex. S) at 18-19; Doc. 33).  The Court also ordered Defendants to provide Plaintiff with contact

information for all of Greishaw's customers, and Defendants promptly complied.  (App. Ex. T).

Plaintiff failed to respond within 60 days as directed by the Court (by May 28, 2007), and

requested no extensions of the deadline from  either Defendants or the Court .  Finally, more than

30 days after the Court's deadline and 97 days after the Court's Order , on July 5, 2007, Plaintiff

responded by submitted a one-page "Revised Estimated Calculation of Damages" that simply

reiterated the $6 million claim.  (App. Ex. U).[8]  No supporting documentation substantiating this

claim was submitted with this response.  Plaintiff's sales records, which he represented as complete,

show only  $22,474.10  in  documents marked "sold" dated after November 1, 2005 and the end of

his employment.  (Declaration of Peter Steckel ("Steckel dec.") (App. Ex. V) at. ¶5).  Documents

from Greishaw's files that are undated but show unconfirmed sales total $167,768.09.  (Id.).

Documents from Greishaw's files alluding to sales between November 1, 2005 and July 15, 2006

---

[7]  PLAINTIFF'S RESPONSE: "Plaintiff's Complaint is incorporated herein by reference.
Also, please see Plaintiff's initial disclosures on this point.  Plaintiff is owed lost wages and
benefits for his wrongful termination , as well as non-pecuniary compensatory and punitive
damages.  Separately, Plaintiff is owed at least five percent of over $6 million in sales as owed
commissions, as well as the liquidated damages and attorneys' fees to which he is entitled under
applicable law."   (App Ex. R).

[8]  Plaintiff's "Revised Calculationof Damages" also erroneously states that Plaintiff was
due $5,134.43 in commissions earned during the period between his hiring in December 2002
and March 2004, when the commission plan changed.  (App. Ex. U).  This amount has been
offset against Plaintiff's overdraw in Defendants' calculations, as reflected in the calculations in
the middle of the page on App. Ex. E at 0001).

total $93,992.73.  (Id.). At his deposition, Greishaw testified that he did not maintain a ledger that

would document independently of Base's records what sales he made for Base during his

employment. (Greishaw dep. (App. Ex. B( at 38).  At Greishaw's deposition counsel for Defendants

attempted to ascertain the factual basis for Plaintiff's damages claim:

> Q: It really goes to a bigger question about whether you believe that – well, if there's
> anything to substantiate the specific $6,277,000 number other than what Gail told you over
> the phone.  Is it correct to say that your answer is, I don't know what sales may have been
> made on my accounts to my customers?  A: I know some of them  I don't know all of them.
> Q: Can you identify some that you know about[?}
>
> A: Again, everybody has a copy of – you know, my files show.
>
> Q: Okay.
>
> A: If I had a quote, I wrote sold on it, stuck it in the file.  You've got a copy of ti.  And you
> would know what was sold."

(Greishaw dep. (App. Ex. B) at 91).  Indeed, Defendants copied all of Plaintiff's files, but they do

not substantiate the claimed $6 million-plus in sales between November 1, 2005 and July 15, 2006.

Again, as explained above, Defendants' records do not show $6 million in sales by Greishaw during

this period; Defendants' review of Greishaw's own records does not show $6 million in sales during

this period; and the records Greishaw has submitted in discovery do not show $6 million in sales

during this period.

    In the course of reviewing Greishaw's career sales and commission records, it was

determined that he was improperly not credited with $53,012.78 for several small sales for which he

should have earned commission credit.  Based on these sales, at 30% of profits Greishaw should

have been credited with an additional $2,245.86 in commissions.  (Strack dec. (App. Ex. O) at ¶11).

    By letter dated August 3, 2007, after the close of discovery (and received by Defendants on

August 6), Plaintiff submitted summaries of purported comparisons between documents supplied

by Base and those of Base's customers.  (App. Ex. BB (Letter of August 3, 2007 and attachments).

These comparisons are grouped in 3 tables.  The first purports to show discrepancies between

invoices paid by Perkins Paper and Base's billing: these differences, which total $1,612.79, are

wholly attributable to sales tax, upon which Greishaw did not earn a commission. (Strack dec. (App.

Ex. O) at ¶17).  With respect to the second table, which purports to show payments made by Perkins

for which Base submitted no matching information, the first four items represent sales made prior

to the date Greishaw was referred Perkins by South.  (Strack dec. (Id.).  The fifth, sixth, and ninth

entries on that table correspond to entries in the recap of commissions summary that was provided

by Defendants to Plaintiff before the discovery period opened.  (App. Ex. E).  The eighth entry

represents a small credit ($4.75) for sales taxes paid (for which Greishaw was not entitled to receive

a commission).  (Id.).  The last two entries reflect sales made months after Greishaw's employment

with Base had ended.  (Id.).  The entry dated 1-19-05 identified as "PER116849" does not

correspond to Base's invoice numbers; it appears to be a debit and its origin is unknown. (Id.)

In Table 3, which purports to analyze billing to Food Tech Structures, what appear to be

discrepancies are again due mainly to sales tax, which was paid by the customer but not credited to

the salesman for purposes of calculating his commission.  Plaintiff's Table also omits several

substantial payments that the customer made.  Greishaw received the commissions he was due on

all of the Food Tech sales identified in Table 3, which were accurately documented in the recap and

summary sheet.  (Strack dec. (App. Ex. O) at ¶17; App. Ex. E).  In sum, the summaries produced

by Plaintiff in his letter of August 3, 2007 reveal neither smoke nor fire, but only a clouded

understanding of Base's sales and billing practices.  They certainly do not show $6 million in sales

between November 1, 2005 and July 15, 2006.

H.     <u>Greishaw's Receipt Of Draws In Excess Of Commissions Earned</u>.

Between March 1, 2004 and the end of his employment on July 15, 2006, Greishaw received a total of $173,234.05 in draws and commission payments.  (App. Ex. E at 0001).  However, by the time his employment was terminated, on July 15, 2006, far from being owed commissions, Greishaw had received $45,900.47 in draws in excess of commissions earned.  (App Ex. E at 0001; Strack dec. (App. Ex. O) at ¶12;).  This amount includes credit for the additional $2,245.86 that Strack's review of company records Base determined was erroneously not credited to Greishaw during his employment.  (Strack dec. (App. Ex. O) at ¶11).  Accordingly, at the time his employment ended Greishaw was overdraws by $45,900.47 in draws paid in excess of commissions earned when his employment was terminated, not $48,146.33 as reflected in Defendants' counterclaim.

## SUMMARY OF CLAIMS AND ARGUMENTS

In Count 1 of his Amended Complaint (Doc. 35) (App. Ex. A) ¶¶28-32, Greishaw alleges that Defendants violated the Pennsylvania Wage Payment and Collections Law ("WPCL"), 43 P.S. §260, by failing to pay him wages   Based only on his phone conversation with Sliger, Greishaw claims to have had sales in excess of $6 million between November 1, 2005 and July 15, 2006, but undisputed evidence demonstrates that his reliance on that number is misplaced.  Plaintiff also maintains that Base made sales to customers for which he should have received credit, but did not; however, the evidence demonstrates that he received proper credit for all sales for which he was due credit and was paid all the commissions he earned.   Defendants deny that Greishaw is due any wages or other pay, but assert rather that he was overdrawn by approximately $45,000 at the time his employment was terminated.  Plaintiff's claims for unpaid wages therefore is due to be dismissed, and Defendants should be granted judgment against Plaintiff on their counterclaim for

overpayment.

In Count II Plaintiff alleges a claim of wrongful termination.  (Doc. 35) (App. Ex. A)  ¶¶33-41.   Plaintiff's wrongful termination count alleges that his termination was in violation of Pennsylvania public policy because it was motivated by his request for the payment of wages in accordance with the WPCL.  (Amended Complaint (App. Ex. A) ¶ 37).  At a hearing on pending motions before the Court on March 29, 2007, Plaintiff admitted that this was the exclusive basis for this claim.  (App. Ex. S at 17-18).  Because well-settled Pennsylvania law holds that termination in retaliation for a demand of payment of wages under the WPCL does not violate public policy so as to create a cause of action for wrongful termination, Plaintiff's Count II should be dismissed.

In Count III Plaintiff accuses Defendants of fraud, arguing that Strack fraudulently induced Greishaw to continue employment by telling him, around the time he received the $40,000 commission check, that his commission plan was being changed from 30% of gross profits to 5% of sales.  Plaintiff argues that he is due compensatory damages in the amount of commissions based on 5% of sales after March 1, 2005, to the extent that exceeds commissions he already was paid, plus punitive damages.  (Amended Complaint (App. Ex. A) ¶42-54).  Plaintiff's own deposition testimony makes it plain that Strack made no such representation or promise to Greishaw; rather, it was Greishaw who observed that the 30% commission plan seemed to "equate to" 5% of sales, and Strack merely agreed that he "can use that."  (Greishaw dep. (App. Ex. B) at 43).  Nothing in that conversation or elsewhere can fairly be read to indicate that Strack committed fraud by inducing Plaintiff to rely on any sort of representation, or that a 'new deal' for commissions was concluded between the parties.  Plaintiff's fraud claim thus is due to be dismissed.

In a Motion to Amend the Amended Complaint (Doc. 42) (App. Ex. W),[9] Plaintiff sought the Court's leave to add Count IV to the Complaint, alleging that Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et seq.*, by failing to pay him minimum wage during half the weeks he was employed. (Proposed Amended Complaint (App. Ex. W) ¶¶55-64). Plaintiff consistently has asserted that he is an outside sales person, which means he is exempt from the minimum wage requirements of the FLSA. Even taking the evidence in the light most favorable to Plaintiff, he cannot show that he was not subject to the outside sales exemption. Plaintiff's minimum wage claim thus is due to be dismissed as well.

Defendants counterclaimed for the amount by which Plaintiff was overdrawn in excess of commissions earned. At the time the counterclaim was filed this amount was believed to be $48,146.77. Upon review of the entire record of Plaintiff's sales, Defendants determined that it had erroneously failed to credit him with $53,53,012.78 in sales, for which he was due an additional $2,245.86 in commissions. Defendants therefore are due judgment on their counterclaim in the amount of $45,900.47.

## ARGUMENT AND AUTHORITY

A.    This Case Is Ripe For Summary Judgment.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 ©. The Court must view the evidence and draw all reasonable inferences therefrom in the light

---

[9] As of the date of this filing, the Court has not ruled on Plaintiff's Motion for Leave to Amend the Amended Complaint, but the Motion has been briefed by both sides.

16

most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Co.</u>, 475 U.S. 574, 587-88, 106 S. Ct. 1348 (1986).  However, the nonmoving party is not entitled to a trial merely on the basis of allegations.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986). The nonmoving party must come forward with significant probative evidence to support its claims. Id. If the nonmoving party fails to make a sufficient showing on an essential element for which it has the burden of proof, the moving party is entitled to summary judgment. Id. at 323, 106 S. Ct. 2548. After reviewing the evidence, the Court must determine whether sufficient evidence has been presented to make the issue of fact a proper jury question. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. Id. at 248, 106 S. Ct. 2505. If the Court concludes that a reasonable jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment.

B.      <u>Judgment Should Be Entered In Favor Of Base On Greishaw's Wage Claim (Count I)</u>.

        "[T]he primary goal of the WPCL is to make whole again, employees whose wages were wrongfully withheld by their employers." <u>Oberneder v. Link Computer Corp.</u>, 449 Pa.Super. 528, 674 A.2d 720, 722 (1996).  It follows that to prevail on such a claim, the employee must establish an entitlement to the wages at issue.  Therefore, to recover anything under WPCL Greishaw must show that he was denied commission payments to which he was entitled – something Plaintiff has utterly failed to do throughout the course of discovery.  Despite Defendants' discovery requests, an Order of the Court compelling him to put 'flesh on the bones' of his damages claim,  and repeated explanations that his reliance on the number provided by Sliger was misplaced, Plaintiff has refused to provide any documentation of sales for which he claims he was denied commissions. Defendant's

review of its own records fails to substantiate his claim – in contrast, Defendants' records show that he had only about $239,000 in total sales during this period, far less than the $6 million he claims. Defendants' review of Plaintiff's own records fails to substantiate his claim – Greishaw's own documents show only $93,992.73 in sales after November 1, 2005.  (App. Ex. V).  He cannot withstand summary judgment simply by continuing to assert that Sliger told him he had more than $6 million in sales after November 1, 2005.

In the course of discovery Defendants submitted to Plaintiff voluminous documentation demonstrating that he had been paid all the commissions he was due during the entire period he was employed by Base, not to mention approximately $48,000 in draws in excess of commissions earned.  (*See, e.g.,* App. Ex. E (Bates stamped docs. 0001 - 00200) (summary of sales, salary & commissions); App Ex. X (Bates stamped docs. 0021-0148) (supporting documentation); App Ex. J (Bates stamped docs. 0149-0209) (sales to other customers)).  Plaintiff offers no more to rebut this documentary evidence than two bare allegations: First, the number Gail Sliger gave him when he phoned her after learning his employment was being ended, *see* Amended Complaint (App. Ex. A) ¶24; and second, the demonstrably false allegation that Strack promised him 5% of sales instead of 30% of profits.  Neither allegation is sufficient to preclude summary judgment in favor of Defendants.

1.   Plaintiff's Claim That He Had Over $6 Million In Sales Between November 1, 2005 and July 15, 2006 Is A Bare Allegation Unsupported by Evidence And, As Such, Insufficient To Preclude Summary Judgment For Defendants.

The undisputed record evidence establishes that Ms. Sliger was neither qualified nor authorized to provide Plaintiff with a correct answer to the question he asked about his year to date

18

sales; that the number she gave him represented his total career sales, not the year to date sales; that the database in which Ms. Sliger found the number was never used or relied upon by Base for any purpose, and had not been maintained in a manner that would make it accurate (i.e., it had not been manually reset at the beginning of each fiscal year because Base simply did not use it).     In other words, Defendants have demonstrated with undisputed evidence that the sole basis for Plaintiff's wage claim is a false number.  Plaintiff's claim thus is revealed as a mere assertion insufficient to preclude summary judgment in favor of Defendant on this claim.  allegations.  Celotex Corp., 477 U.S. at 324 (mere allegations insufficient to preclude summary judgment; nonmoving party must come forward with significant probative evidence to support its claims).  Plaintiff admitted in deposition that he kept no ledgers that would show sales he claims to have made that Base failed to take into account.  (Greishaw dep. (App. Ex. B) at 38).  Plaintiff can point to no significant, probative evidence that he had such astronomical sales.  He has failed to point to any evidence of commissions due at all other than what Ms. Sliger told him.  He cannot avoid summary judgment simply by asserting that he does not believe the records Base has disclosed to him, and does believe what Ms. Sliger said.  His reliance on the number provided by Ms. Sliger – a number demonstrated by Defendants to be utterly false and unreliable – is legally insufficient to preclude summary judgment in favor of Defendants on the issue of unpaid wages, and judgment should be entered in favor of Defendants on Count 1 of Plaintiff's Amended Complaint.

2.     No Reasonable Factfinder Could Conclude That Strack Changed Greishaw's Compensation Plan From 30% Of Profits To 5% Of Sales.

Plaintiff alleges that in the conversation that occurred around the time he received the $40,000 commission check, he observed to Strack that the amount appeared to "equate to" 5% of

sales, and that Strack responded, "You can use that."  (Greishaw dep. (App. Ex. B) at 43: "And I said, it looks to me like it equates to about 5 percent of sales.  And he says, yes, you can use that."). There is simply no way for this exchange to be read as a promise by Strack that henceforward Greishaw's commission plan would be 5% of sales rather than 30% of profits: the words simply will not support that meaning.  Not only was it Greishaw who, by his own admission, came up with the 5% figure, Strack did no more than say "you can use that," which at most can be interpreted as an admission that it could serve as a rough proxy or rule of thumb for estimating 30% of profits.

"To be enforce[a]ble, a contract must be complete. That is to say, it must represent a meeting of the parties' minds on the essential terms of their agreement." Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 285 Pa.Super. 84, 426 A.2d 1152, 1154 (1981)m quoted in Ruthrauff, Inc. v. Ravin, Inc., 914 A.2d 880, 889 (Pa.Super.,2006).  The first essential of any contract requires an offer or promise to be definite and certain. GMH Assocs., Inc. v. The Prudential Realty Group, 2000 WL 228918, at *6 (Pa.Super.Ct. Mar. 1, 2000) (citing Fahringer v. Strine Estate, 429 Pa. 48, 59, 216 A.2d 82, 88 (1966)).  The party asserting its existence bears the burden of demonstrating the parties had a "meeting of the minds." Nernberg & Laffey v. Patterson, 411 Pa.Super. 417, 423, 601 A.2d 1237, 1240 (1991)(quoting Hydro-Flex, Inc. v. Alter Bolt Co., 223 Pa.Super. 228, 234, 296 A.2d 874, 878 (1972)) (citation omitted).

Greishaw's own testimony demonstrates that there was no "meeting of the minds" as to a modification of his commission arrangement with Base.  No reasonable factfinder could read Strack's "you can use that" comment to mean that Defendants assented to a dramatic revision of the terms of Greishaw's commission plan.  Greishaw's own words make such a conclusion impossible: he says he told Strack that the commission appeared to "***equate to***" 5% of sales, not that there was

20

a new commission plan for 5% of sales rather than 30& of profits.  (Greishaw dep. (App. Ex. B) at 43).  Plainly, there was no "meeting of the minds" as to a new commission plan for Greishaw, and judgment should be entered in Defendants' favor on this claim.

C.     Pennsylvania's At-Will Employment Doctrine Precludes Plaintiff's Wrongful Termination Claim (Count II), And Judgment On That Claim Should Be Entered In Favor Of Defendants..

In Pennsylvania, the at-will employment doctrine "holds that an employer may terminate an employee for any reason at all, unless restrained by contract." Carlson v. Community Ambulance Services, Inc., 824 A.2d 1228, 1232 (Pa.Super. 2003). The doctrine creates a strong presumption that a contractual employment relationship does not exist, and it impedes an employee's ability to bring a cause of action for the termination of the employment relationship. Id.  Pennsylvania Courts simply do not recognize such claims in the context of at-will employment, absent a showing of egregious circumstances that the termination violated public policy.  Plaintiff has admitted that on the record, in open court, that no such circumstances exist in this case.  Summary judgment is due to be entered in favor of Defendants on this claim.

1.     Pennsylvania Courts Have Explicitly Rejected Wrongful Termianation Claims Where The Alleged "Public Policy" Violation Is Termination For Complaining About Not Receiving Wages Or Sales Commissions.

In Janis v. La-Z-Boy Furniture Galleries, 2006 WL 724157, *8 (E.D. Pa. 2006) (copy attached as App. Ex. Y)) the Court granted summary judgment to the employer where the employee had been fired after complaining about not receiving sales commissions; expressly finding that the termination did not violate public policy.  *See also*  Elliott v. Horizons Unlimited Computer

Services, 1989 WL 223549 (Pa. Com. Pl. 1989) (discharge of an at-will employee in retaliation for filing a claim under the Wage, Payment, and Collection Act held not to violate public policy); Booth v. McDonnell Douglas Truck Servs., Inc., 401 Pa.Super. 234, 585 A.2d 24 (Pa. Super. Ct. 1991) (firing someone for complaining that they had not been paid sales commissions does not violate a clear mandate of Pennsylvania public policy and, therefore, does not give rise to a claim for wrongful discharge).

At the March 29, 2007 motions hearing in the instant case, Plaintiff admitted that the exclusive basis for his wrongful termination claim was that his employment had been terminated because he requested payment of sales commissions allegedly due him.  T. (App. Ex. S) 17-18.  The Court ascertained that this was the only reason for his claim that his termination violated public policy.  Id.  Accordingly, because Plaintiff has admitted that his wrongful termination claim is premised upon facts that Pennsylvania courts have plainly held will not support a claim of wrongful termination in violation of public policy, Count II of Plaintiff's Amended Complaint is due to be dismissed.

    2.    <u>Pennsylvania Courts Have Recognized Wrongful Termination Claims In Only Narrow Circumstances, None Of Which Are Present Here.</u>

Pennsylvania courts have recognized very limited exceptions to the doctrine of at-will employment.  In Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974). The issue involved a discharge based on an employee's report to his superiors concerning the unsafe nature of steel pipe being manufactured and sold by his company. Although, in Geary the Court held that the employee did not state a cause of action for wrongful discharge, it did recognize that if a violation of a clear mandate of public policy results in the termination of an at-will employee, that

employee would have a right of action for wrongful discharge. *Id.* at 180, *cited with approval in* Rothrock v. Rothrock Motor Sales, Inc., 584 Pa. 297, 304, 883 A.2d 511, 515 (Pa. 2005).

After Geary, public policy exceptions to the at-will employment doctrine have been adopted only in very limited circumstances. Pennsylvania courts have permitted the following wrongful termination claims when public policy concerns have been implicated: Kroen v. Bedway Security Agency, 430 Pa.Super. 83, 633 A.2d 628 (1993) (holding that an employee was discharged for refusing to submit to a polygraph test); Highhouse v. Avery Transportation, 443 Pa.Super. 120, 660 A.2d 1374 (1995) (concluding that an employee was wrongfully discharged for filing of an unemployment compensation claim); Raykovitz v. K Mart Corp., 445 Pa.Super. 378, 665 A.2d 833 (1995)(same); and Shick v. Shirey, 552 Pa. 590, 716 A.2d 1231 (1998) (holding that an employee was wrongfully terminated for filing a workers' compensation claim).

No such circumstances are present in the instant case. Rather, Plaintiff has admitted on the record that the only reason for his wrongful termination claim is that his employment was terminated because he sought sales commissions he believed were due to him. (T. (App. Ex. S) at 17-18). These facts simply will not support a claim of wrongful termination in Pennsylvania, and judgment on this claim thus is due to be entered in favor of Defendants.

D.    Plaintiff Has Failed To Make Out A Prima Facie Case Of Fraud, And Judgment Should Be Entered In Favor Of Defendants On Count III Of Plaintiff's Complaint.

"Fraud" consists of "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." Moser v. DeSetta, 527 Pa. 157, 163, 589 A.2d 679, 682 (1991). To demonstrate fraud, the plaintiff must establish the following

elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Gibbs v. Ernst, 538 Pa. 193, 207-08, 647 A.2d 882, 889 (1994),

Plaintiff's entire evidence of "fraud" is his conversation with Strack in which, according to his own deposition testimony, he observed to Strack that it looked to him like his $40,000 commission check, which he acknowledges represented commissions calculated on the basis of 30% of profits, "equates to about 5percent of sales," to which Strack replied, "yes, you can use that." (Greishaw dep. (App. Ex. B) at 43. This fails to meet the requirements of a *prima facie* case of fraud. It may indeed be a representation which is material to the transaction at hand, but Greishaw cannot demonstrate that it was false, or that Strack intended to mislead Greishaw. A commission calculated as 30% of profits could well equate to 5% of the sale price – possibly even more[10] – but that does not mean that Strack was telling Greishaw that he was substituting 5% of sales for 30% of profits. Nor did Greishaw have any justification for relying on Strack's assent to his estimation: Strack told him only, "you can use that," which means no more than it says. Finally, Greishaw cannot show that he relied on this conversation to his detriment. "Bold unsupported assertions cannot create genuine issues of material fact" sufficient to overcome the grant of a motion for summary judgment. McCain v. Pennbank, 379 Pa.Super. 313, 549 A.2d 1311, 1313-14 (1988).

E.    If Plaintiff Is Allowed To Amend His Complaint To Add An FLSA Claim For Minimum

---

[10] This can be demonstrated by simple arithmetic. Five percent of a $100,000 sale would be $5,000. If a $100,000 sale produced a profit of $16,666, which would not be unrealistic, then 30% of the profit also would indeed be $5000.

<u>Wages (Count IV), Judgment On That Claim Should Be Entered In Favor Of Defendants</u>.

Shortly before the close of discovery Plaintiff sought leave of Court to amend the Complaint to allege minimum wage claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. §206, (App. Ex. W (Proposed Second Amended Complaint) Count IV)and Pennsylvania's Minimum Wage Act, 43 P.S. §333.103(h) (App. Ex. W, Count V) (Doc. 42). Defendants have opposed Plaintiff's Motion. (App. Ex. Z (Doc. 44)). If the Court decides to grant Plaintiff's motion and allow the amendment, the Court also should grant summary judgment in favor of Defendant because the record demonstrates that Plaintiff was an outside salesperson exempt from State and Federal minimum wage requirements.

Plaintiff himself alleges that he was hired as an outside salesperson, which makes him exempt from the minimum wage requirement he now seeks. (Proposed Amended Complaint (App. Ex. W) ¶9: "Plaintiff began his employment *as an outside salesperson* with Defendant Base Manufacturing on approximately December 19, 2002." (Emphasis added)). While job titles are not dispositive in FLSA matters, when the Plaintiff describes his own job as "an outside salesperson" it is certainly difficult to find him otherwise.

The FLSA exempts an outside salesperson from the minimum wage requirements for overwhelmingly practical reasons: an outside salesperson who calls on customers for a living and thus spends the bulk of his time away from the employer's place of business cannot readily be supervised by the employer, and the employer is not in a good position to ascertain the hours worked by such an employee. 29 U.S.C. §213(a)(1). It is not disputed that Plaintiff was based in Pennsylvania during the entire period of his employment with Defendant, and thus Mr. Strack was hardly in any position to monitor Plaintiff's hours worked.

Plaintiff alleges in his proposed Second Amended Complaint that he did 90% of his work from his home office over the telephone. Proposed Second Amended Complaint (App. Ex. W) at ¶10. This is a clumsy attempt to climb inside the new exception for home offices in the recently revised FLSA regulations, 29 C.F.R. §541.502, but it fails. Plaintiff's work on the phone from his home office was incidental to and in conjunction with his outside sales activity, as contemplated by the FLSA regulations. *See* 29 C.F.R. §541.500(b) ("In determining the primary duty of an outside sales employee, work performed ***incidental to and in conjunction with*** the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.") (emphasis added); §541.502(a) (". . . Outside sales does not include sales made by mail, telephone or the Internet ***unless such contact is used merely as an adjunct*** to personal calls.) (emphasis added). Greishaw testified at his deposition that his telephone work was in support of his sales activity. (Greishaw dep. (App. Ex. B) at 19, 22). Greishaw was no Donna Powell, who handles inside sales exclusively. He is not entitled to the minimum wage protection afforded to an employee like her.

Plaintiff's admission, *see* ¶9 of Plaintiff's Second Proposed Amended Complaint (App. Ex. W) that Plaintiff was hired to be an outside sales person, for whom the FLSA does not require any guaranteed base salary. *See* 29 C.F.R. §541.500( c). Defendant Strack's statement that Plaintiff was not guaranteed any minimum salary thus reveals no new cause of action. In ¶4 of his Motion Plaintiff claims that he did 90% of his work from his home office in North East, Pennsylvania, but this also was admitted in the original Answer, and furthermore is not dispositive, since work done from a home office by an outside sales person that is incidental to and in conjunction with outside

sales still qualifies as outside sales work and does not necessarily invalidate that exemption and transform an outside sales person into an inside sales person.  *See* 29 C.F.R. §§541.500(b); 541.502(a).

Plaintiff's poor sales record may have resulted from him electing to stay at home by the phone instead of making calls on prospective customers, but the latter is plainly what both parties contemplated when he was hired.  The undisputed facts in the record demonstrate that Plaintiff was an outside salesperson exempt from the minimum wage requirement, and judgment should be entered in favor of Defendants on that claim if the Court allows it to go forward.

F.    Judgment Should Be Entered In Favor Of Defendants On Their Counterclaim Against Plaintiff For Overpayment Of Draw.

In their Answer to Plaintiff's original Complaint, Defendants counterclaimed against Plaintiff for $48,146.33 which Greishaw received in draws in excess of commissions earned before his employment was terminated in July 2006.  (App. Ex. AA (Doc. 2)).  Pursuant to Strack's review of the documentation, it was determined that an additional $2,245.86 in commissions was due to Greishaw for several small sales that were inadvertently not credited to him, so that amount should be offset against Greishaw's overdra3w liability, reducing it to $$45,900.47.  (Strack Dec. (App. Ex. O) at ¶¶11, 12).  This claim is substantiated by documents produced to Plaintiff in the course of discovery, *see* specifically App. Ex. E (Bates stamped doc. 0001), which is a recap of all salary, draw, and commissions paid to Plaintiff during the entire period of his employment.  Plaintiff has denied Defendants' allegations, but has failed to produce any substantive evidence sufficient to preclude judgment in Defendants' favor on the counterclaim.  Collincini v. Honeywell, Inc., 411 Pa.Super. 166,171,  601 A.2d 292, 294  (Pa.Super.,1991) (granting employer's counterclaim for

unreimbursed travel advances paid to employee prior to termination of employment).  Accordingly, if the Court finds that Defendants are due to be granted summary judgment in their favor on Plaintiff's claims, summary judgment should also be granted in Defendants' favor on their counterclaim for the draws Plaintiff received in excess of commissions earned during the course of his employment.

## **CONCLUSION**

For the reasons set forth above, Defendants pray the Court to enter judgment in their favor on all of Plaintiff's claims and on Defendant's counterclaim against Plaintiff.

Respectfully submitted this <u>6th</u> day of August, 2007.


Wimberly, Lawson, Steckel,
Weathersby & Schneider, PC
3400 Peachtree Rd. NE Suite 400
Atlanta, Georgia 30326
(404) 365-0900
fax: (404) 261-3707
bdorminy@bellsouth.net

<u>s/Elizabeth K. Dorminey </u>
Elizabeth K. Dorminey
*Attorneys for Defendants*

F:\Data\Client\Base manufacturing\Pleadings\msj\msj memo.wpd

28

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD E. GREISHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | |
| **v.** | ) | **06-184 ERIE** |
| | ) | |
| **BASE MANUFACTURING,** | ) | |
| **STEVE SOUTH, an individual, and** | ) | |
| **B. HARRY STRACK, JR., an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above-styled **Defendants' Motion, Statement of Undisputed Material Facts, and Memorandum of Law In Support of Motion for Summary Judgment** has been electronically filed with the Court and will be served automatically upon counsel as follows:

> Mark J. Kuhar
> Knox, McLaughlin, Gornall & Sennett, PC
> 120 West Tenth Street
> Erie, PA 16501-1461
> Mkuhar@kmgslaw.com


                                    s/Elizabeth K. Dorminey
Wimberly, Lawson, Steckel,          Elizabeth K. Dorminey
Weathersby & Schneider, PC          *Attorneys for Defendants*
3400 Peachtree Rd. NE Suite 400
Atlanta, Georgia 30326
(404) 365-0900
fax: (404) 261-3707
bdorminy@bellsouth.net


F:\Data\Client\Base manufacturing\Pleadings\msj\msj memo.wpd

29